1  Scott D. Baker (SBN 84923)
   Email: sbaker@reedsmith.com
2  Jonah D. Mitchell (SBN 203511)
   Email: jmitchell@reedsmith.com
3  REED SMITH LLP
   Two Embarcadero Center, Suite 2000
4  San Francisco, CA 94111-3922

5  **Mailing Address:**
   P.O. Box 7936
6  San Francisco, CA 94120-7936

7  Telephone:    +1 415 543 8700
   Facsimile:    +1 415 391 8269
8
   Attorneys for Plaintiff
9  S.H. Silver Company, Inc.

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12  S.H. SILVER COMPANY, INC.,              | Case No. CV 08-03550 CRB
13              Plaintiff,                   | **PLAINTIFF S.H. SILVER COMPANY, INC.'S NOTICE OF MOTION AND APPLICATION FOR ISSUANCE OF RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR ISSUANCE OF RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT**
14      vs.
15  DAVID MORRIS INTERNATIONAL LTD.,
16              Defendant.
17
18                                          | Date:   September 5, 2008
                                             | Time:   10:00 a.m.
19                                           | Place:  Courtroom 8
20                                          | Honorable Charles R. Breyer

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Case No.: CV 08-03550 CRB                                                DOCSSFO-12522713.2
NOTICE OF MOTION AND APPLICATION FOR ISSUANCE OF RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT; MEMORANDUM OF POINTS AND AUTHORITIES

TABLE OF CONTENTS

I. INTRODUCTION ..... 2

II. FACTUAL BACKGROUND ..... 3

III. LEGAL ANALYSIS ..... 8

    A. S.H. Silver's Claim Against David Morris Is A Claim Upon Which An Attachment May Be Properly Issued ..... 8

    B. S.H. Silver Has Established The Probable Validity Of Its Claim Against David Morris ..... 9

    C. S.H. Silver Does Not Seek An Attachment For An Improper Purpose ..... 12

    D. The Amount To Be Secured Is Greater Than Zero ..... 12

IV. CONCLUSION ..... 12

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Case No.: CV 08-03550 CRB     – i –     DOCSSFO-12522713.2
NOTICE OF MOTION AND APPLICATION FOR ISSUANCE OF RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT; MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF AUTHORITIES

## CASES

*Koninklijke Philips Electronics N.V. v. Int'l Disc Manufacturers*,
    2006 WL 4532985 (C.D. Cal. 2006).................................................................................8

*Loeb & Loeb v. Beverly Glen Music*, 156 Cal.App.3d 1110 (1985)....................................8

*Lorber Industries v. Turbulence, Inc.*, 175 Cal.App.3d 532 (1985) ....................................8

*Whitehouse v. Six Corporation, Inc.*, 40 Cal.App.4th 527 (1995) ........................................8

## STATUTES

Cal. Civ. Proc. Code § 481.190 ............................................................................................ 9

Cal. Civ. Proc. Code § 483.010 .............................................................................................9

Cal. Civ. Proc. Code § 484.050 .............................................................................................9

Cal. Civ. Proc. Code § 484.090 ........................................................................................8, 9

Federal Rule of Civil Procedure 64 ......................................................................................8

# NOTICE OF MOTION

Please take notice that on September 5, 2008, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Charles R. Breyer, located in Courtroom 8 of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, Courtroom 8, 19th Floor, San Francisco, California, Plaintiff S.H. Silver Company, Inc. ("S.H. Silver") will and hereby does move the Court and apply for the issuance of a right to attach order and writ of attachment in the amount of at least $566,564.43.

This Motion is made pursuant to Federal Rule of Civil Procedure 64 and California Code of Civil Procedure sections 484.090 and 483.010, and is based on this Notice of Motion and Application, the Memorandum of Points and Authorities attached hereto, the Declaration of Stephen H. Silver, all pleadings and paper on file in this action and such further evidence that may be submitted to the Court at or before the hearing.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Over a year ago, in July 2007, Defendant David Morris International Ltd. ("David Morris") bought a pair of Cartier Sapphire earrings from Plaintiff S.H. Silver Company, Inc. ("S.H. Silver") and took possession of the earrings. Pursuant to the agreement, David Morris was to pay the purchase price in two installments, as documented in an invoice delivered to David Morris. David Morris made the first payment and exercised ownership of the earrings by "re-cutting" the sapphire stones and permanently altering the composition of the sapphire stones in the process. Nonetheless, and despite S.H. Silver's repeated demands, David Morris steadfastly refuses to make the second payment to S.H. Silver.[1]

S.H. Silver's claim falls squarely within the requirements for an attachment: (1) the claim, which arises out of an unequivocal agreement documented in an invoice, is one upon which an attachment may be based; (2) the claim is "probably valid" – indeed, as noted above, David Morris bought and took possession of the earrings, paid the first of two scheduled payments and exercised ownership over the earrings by re-cutting the sapphires and permanently altering their composition; (3) attachment is not sought for improper purpose – S.H. Silver is simply seeking to secure the recovery of amounts which are now over ten months late; and (4) the amount sought to be secured, $566,564.43, is greater than zero. Accordingly, an attachment should issue.

---

[1] In its latest effort to only further delay the day when it must meet its payment obligations to S.H. Silver, David Morris has filed a misguided motion to dismiss for lack of personal jurisdiction which is scheduled to be heard on the same day as this Motion.

## II. FACTUAL BACKGROUND

S.H. Silver is a premier jewelry house in Menlo Park, California, offering vintage and modern jewelry. S.H. Silver enjoys a reputation as one of the industry's most trusted names in acquiring and placing some of the finest estate jewelry in the world. [Declaration of Stephen H. Silver ISO App. for Right to Attach Order and Writ of Attachment ("Silver Decl."), ¶ 2.] This attachment concerns a pair of Cartier Sapphire earrings that S.H. Silver sold to David Morris, a jewelry retailer with shops in London and Palm Beach, Florida, for $948,000. [Silver Decl., ¶ 2.] The purchase was payable in two installments. David Morris made the first payment of $474,000, but failed to make the second payment of $474,000 (due on August 16, 2007) despite repeated inquiries. [Silver Decl., ¶ 2.] Inclusive of finance charges, as of July 31, 2008, David Morris owes a total of $566,564.43 for its purchase of the Cartier Sapphire earrings. [Silver Decl., ¶ 2.] David Morris' purchase of the Cartier Sapphire earrings is described in greater detail below.

In early June 2007, a third party broker introduced S.H. Silver's Chairman and CEO, Stephen Silver, to David Morris and its principal, Jeremy Morris, and Sales Director, William Holbech. Following the broker's introduction, the parties' representatives made arrangements for the consignment of several jewelry pieces to David Morris and the delivery of the jewelry. [Silver Decl., ¶ 3.] To that end, before delivering the jewelry, on June 22, 2007, S.H. Silver sent a consignment for the jewelry pieces. Among others, the consignment identified a pair of Loose Sugarloaf Cabochon Sapphires (the "Sapphires") and the accompanying Cartier Platinum and Diamond Ear Clip semi mounts for the Earrings (collectively, the "Earrings"). [Silver Decl., ¶ 5, Exs. A, B.]

Per the consignment arrangements, at the end of June 2007, S.H. Silver delivered the Earrings to David Morris. Along with the Earrings, S.H. Silver provided a copy of the SSEF certification that it held for the Sapphires. SSEF, a Gemological Laboratory, had certified the Sapphires as being of Kashmir origin. [Silver Decl., ¶ 6, Ex. C.]

Shortly thereafter, around July 3, 2007, David Morris' principal Mr. Morris contacted Mr. Silver and expressed an interest in purchasing the Earrings directly for David Morris, as opposed to selling them on consignment to a third party. [Silver Decl., ¶ 7.] Mr. Silver met Mr. Morris at the David Morris store that same day where they engaged in negotiations toward the purchase of the Earrings. During the course of their discussions, Mr. Morris suggested that he was considering cutting the Sapphires and remaking the Earrings and obtaining a certification from a different Gemological Laboratory, Gubelin, and asked Mr. Silver's opinion on that approach. [Silver Decl., ¶ 7.] Mr. Silver told Mr. Morris that S.H. Silver had elected to keep the Sapphires in their original form as a pair of original Cartier Kashmir Sapphire earrings, but that the beauty and value of the Sapphires are in the eye of the beholder, and that, as the new owner, it would be up to David Morris to do whatever it wanted with them. Mr. Morris suggested that he would consult with his jewelry cutter and Mr. Silver and Mr. Morris then turned their attention to negotiation of a price for the Earrings. [Silver Decl., ¶ 7.] Mr. Silver and Mr. Morris soon finalized an agreement for the purchase of the Earrings, settling on a price of $948,000 to be paid immediately by wire to S.H. Silver's bank account (the "Agreement"). As a practical matter, David Morris already held the Earrings and a copy of the SSEF certification per the consignment arrangement, but title/possession was transferred contemporaneously with the Agreement, on or about July 3, 2007. [Silver Decl., ¶ 7.]

Shortly after the sale was completed, Mr. Morris contacted Mr. Silver and asked him to adjust the payment terms of the Agreement by extending David Morris some credit. [Silver Decl., ¶ 8.] Mr. Morris mentioned again that he was planning on cutting the stones and would re-certify the stones after they were finished, and therefore would need some time before he would be in a position to sell the Earrings (in other words, to be able to recoup his investment). [Silver Decl., ¶ 8.] As a courtesy and accommodation, Mr. Silver agreed that 50% of the purchase price, $474,000, could be paid immediately and that the balance, $474,000, could be paid in 45 days, or by August 16, 2007. [Silver Decl., ¶ 8.] Mr. Morris agreed and these terms were documented in an invoice dated July 2, 2007. [Silver Decl., ¶ 8, Ex. D.]

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

David Morris did not make the first payment immediately, as it was required to do under the Agreement. Instead, over two weeks passed, at which point Mr. Silver contacted David Morris' offices to request that the delinquent payment be made. [Silver Decl., ¶ 9.] Mr. Silver spoke with David Morris' Sales Director Mr. Holbech, who told Mr. Silver that he did not have authority to wire the payment owed. [Silver Decl., ¶ 9.] Growing increasingly frustrated, Mr. Silver asked Mr. Holbech to make arrangements to send the payment or simply return the Earrings. [Silver Decl., ¶ 9.] Mr. Holbech apologized for the delay and said he would talk with Mr. Morris and make arrangements to wire the money. [Silver Decl., ¶ 9.]

Soon thereafter, Mr. Holbech contacted Mr. Silver and indicated he had spoken with Mr. Morris and would send the entire amount owed for the Earrings, including the second payment not yet due, to compensate for the delinquency on the first payment. [Silver Decl., ¶ 10.] Mr. Silver told Mr. Holbech that it was not necessary to send the entire amount at that time and asked that David Morris simply honor the terms of the Agreement and settle the second payment when it came due. [Silver Decl., ¶ 10.] The next day, July 19, 2007, David Morris wired the first payment due under the Agreement to S.H. Silver's bank account. [Silver Decl., ¶ 10.]

The remaining balance of $474,000 was due on August 16, 2007. In breach of the Agreement, David Morris did not make payment by August 16, 2007, and has not made any payment since that time despite repeated inquiries. [Silver Decl., ¶ 11.]

Approximately one month after the deadline for the second payment had passed, Mr. Silver telephoned Mr. Morris to inquire about the status of the payment. During this telephone conversation, Mr. Morris advised Mr. Silver that he had the Sapphires cut and had attempted to obtain a new certification from Gubelin, another Gemological Laboratory, but that Gubelin would not certify the Sapphires as being of Kashmir origin. [Silver Decl., ¶ 12.] Mr. Morris told Mr. Silver that David Morris was not going to make payment until the certification was resolved,

although he assured Mr. Silver that he never questioned the Kashmir origin of the Sapphires and that everything would get sorted out in short order. [Silver Decl., ¶ 12.]

Mr. Silver told Mr. Morris that he was violating the terms of the Agreement, and reminded him that what he chose to do with the Sapphires after David Morris purchased them from S.H. Silver was up to him, but that did not affect David Morris' payment obligations to S.H. Silver, nor did David Morris' attempts to obtain a new certification. [Silver Decl., ¶ 12.] Accordingly, Mr. Silver asked Mr. Morris to send the payment owed. Mr. Morris still refused to make payment, stating words to the effect of "I'm not paying this payment until I'm ready" and hung-up. [Silver Decl., ¶ 12.]

After another month passed with no payment from David Morris, S.H. Silver again demanded payment on October 31, 2007. [Silver Decl., ¶ 13, Ex. E.] In response, David Morris falsely claimed *for the first time* that the sale of the Earrings was *subject to* obtaining a Gubelin certification. [Silver Decl., ¶ 14, Ex. F.] As set forth above, and discussed in more detail below, there was never any such condition. [Silver Decl., ¶ 14.] Indeed, at no point before the Agreement did David Morris ever mention or propose any such condition. And, in fact, there never was any such condition. David Morris' post-default attempt to insert a certification condition into the Agreement makes no sense and is belied by its own actions over the course of the transaction.

For instance, if the purchase was subject to David Morris obtaining a Gubelin certification, it would have made no sense for David Morris to make *any* payment without obtaining the certification. [Silver Decl., ¶ 16.] Nevertheless, as set forth above, David Morris made the first payment under the Agreement (albeit late); in fact, David Morris committed to make the second payment (in other words, the entire balance) early to compensate for its delay in making the first payment.[2] [Silver Decl., ¶ 16.] And, David Morris did this even though, at that time, it had not

---

[2] Ultimately, David Morris only sent the first installment, as opposed to the entire balance, after S.H. Silver told David Morris to simply honor the terms of the original agreement. [Silver Decl., ¶ 10.]

obtained a new certification. [Silver Decl., ¶ 16.] At no point did David Morris ever take the position that it needed to obtain a new certification before it was obligated to pay S.H. Silver. Instead, it simply proceeded to wire the first payment. [Silver Decl., ¶ 16.]

David Morris' post-default position also defies common business sense. As noted above, after buying the Sapphires, David Morris elected to cut the Sapphires. [Silver Decl., ¶ 17.] Naturally, this permanently altered the composition of the Sapphires. As part of that process, the characteristics which allowed the Gemological Laboratory to identify the Sapphires as being of Kashmir origin could have been compromised or destroyed. [Silver Decl., ¶ 17.] Of course, S.H. Silver never would have – and, indeed, did not – assume the risks associated with David Morris' cutting the Sapphires. [Silver Decl., ¶ 17.] The parties' deal was simple: David Morris bought the Earrings outright, with the SSEF certification S.H. Silver had obtained for them, for $948,000. [Silver Decl., ¶ 17.] Whatever David Morris elected to do with the Earrings after the purchase was up to David Morris, as the new owner of the Earrings. That, however, had nothing to do with David Morris' payment obligations to S.H. Silver under the Agreement. [Silver Decl., ¶ 17.]

Because David Morris has continued to refuse to pay the amounts owed to S.H. Silver, S.H. Silver was forced to initiate this action. With finance charges, as of July 31, 2008, David Morris owes S.H. Silver $566,564.43 for the Earrings. [Silver Decl., ¶ 19, Ex. G.] S.H. Silver seeks to attach David Morris' assets for the sole purpose of securing recovery of the amounts that David Morris owes under the Agreement.[3] [Silver Decl., ¶ 19.]

---

[3] S.H. Silver will supplement its papers to update the amounts owed due to additional finance charges incurred in advance of the hearing.

## III. LEGAL ANALYSIS

As a threshold matter, pursuant to Federal Rule of Civil Procedure 64, state law provides all remedies when property is to be seized for purposes of securing satisfaction of a judgment, including a writ of attachment. Thus, California law governs whether a writ of attachment and right to attach order may issue here. *See Koninklijke Philips Electronics N.V. v. Int'l Disc Manufacturers*, 2006 WL 4532985, *4 (C.D. Cal. 2006).

A writ of attachment "allows a plaintiff, in certain prescribed instances, to obtain a pretrial seizure of the property of a defendant-debtor." *Whitehouse v. Six Corporation, Inc.*, 40 Cal.App.4th 527, 533 (1995); *see also Lorber Industries v. Turbulence, Inc.*, 175 Cal.App.3d 532, 535 (1985) (writ of attachment allows creditor who has established a prima facie claim to have debtor's assets seized pending final adjudication). Thus, an attachment ensures that litigation is not pursued in vain or that the ends of a successful suit are not frustrated. *See Loeb & Loeb v. Beverly Glen Music*, 156 Cal.App.3d 1110 (1985).

Under California Code of Civil Procedure 484.090(a), an attachment shall issue if: (1) the claim upon which the attachment is based is one upon which an attachment may be issued; (2) the plaintiff has established the probable validity of the claim upon which the attachment is based; (3) the attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based; and (4) the amount to be secured by the attachment is greater than zero.

### A. S.H. Silver's Claim Against David Morris Is A Claim Upon Which An Attachment May Be Properly Issued

As set forth above, the first requirement for an attachment order is that the claim is subject to an attachment. Cal. Civ. Proc. Code. § 484.090(a)(1). In turn, California Code of Civil

Procedure Section 483.010 provides that a writ of attachment may issue upon an unsecured claim for money based on an express or implied contract for a "fixed or readily ascertainable amount" of at least $500. S.H. Silver's claim meets each of the elements under Section 483.010 and thereby also meets the first requirement for an attachment under Section 484.090(a). Indeed, the claim is based upon a contract – the Earring Agreement. And, the claim is for a "fixed or readily ascertainable amount" in excess of $500. Specifically, S.H. Silver seeks an attachment in the amount of $566,564.43, which is derived directly from the Invoice for the Earrings. [*See* Silver Decl., Exs. D, G.]

### B.   S.H. Silver Has Established The Probable Validity Of Its Claim Against David Morris

In addition, S.H. Silver has met the second requirement for an attachment, as it has demonstrated that its claim is "probably valid". Cal. Civ. Proc. Code §§ 484.050; 484.090(a)(2). To demonstrate "probable validity," a plaintiff need only show it is "more likely than not" that it will obtain a judgment on the underlying claim. Cal. Civ. Proc. Code § 481.190. S.H. Silver far exceeds this threshold.

As set forth above, the parties' Agreement was simple. David Morris bought the Earrings from S.H. Silver for $948,000, payable in two installments, the first, immediately, and the second a month and a half later, by August 16, 2007. David Morris made the first payment of $474,000 (albeit over two weeks late), but, in breach of the Agreement, failed to make the second payment of $474,000. Thus, S.H. Silver's claim is probably valid.

That should be the end of the story, but a month after it defaulted on its payment obligation, David Morris cobbled together a transparent excuse for its non-payment. S.H. Silver anticipates that David Morris will attempt to rely upon this "excuse" here as well. After its default, David Morris claimed for the first time (and now continues to claim) that its Agreement to purchase the Earrings was *conditional* upon David Morris obtaining a new certification from a gemological

1   laboratory. David Morris' excuse is fundamentally flawed, however, and does not come close to

2   rebutting the probable validity of S.H. Silver's claim. Indeed, David Morris' post-default excuse

3   does not square with (1) the parties' actual Agreement, (2) its own conduct following the Agreement

4   or (3) common business sense.

6   First, David Morris' post-default excuse is simply wrong because it is contrary to the

7   parties' Agreement. David Morris never mentioned or proposed any such condition during the

8   parties' negotiations on July 3, 2007. Instead, the Agreement was for the outright purchase of the

9   Earrings for $948,000, payable immediately. The payment terms were later adjusted to allow for

10  two installment payments, one immediately and one forty-five days later, but no other terms of the

11  Agreement were altered. The Agreement is thus reflected in the Invoice, which nowhere mentions

12  any certification condition. In short, there was never any such condition.

14  Second, David Morris' excuse is belied by its own conduct before it defaulted on its

15  payment obligations. David Morris did not propose any "condition" on payment or claim there was

16  any such "condition" at any point during the parties' interactions, before or after the Agreement was

17  consummated:

19  (1) As noted above, David Morris did not mention or propose such a
    condition when Mr. Silver and Mr. Morris negotiated the Agreement on July
    3, 2007. Instead, the Agreement was for the outright purchase of the Earrings
20  for $948,000, payable immediately.

21  (2) David Morris did not mention, propose or claim there was such a
    condition when Mr. Morris contacted Mr. Silver and asked to extend the
22  payment deadline later that day on July 3, 2007.

23  (3) David Morris did not mention, propose or claim there was such a
    condition after receiving the Invoice for the Earrings from S.H. Silver
24  following the adjustment to the payment terms on July 3, 2007.

25  (4) David Morris did not mention, propose or claim there was such a
    condition when Mr. Silver contacted David Morris after David Morris failed
26  to timely make the first payment. Instead, Mr. Holbech told Mr. Silver that he
    would contact Mr. Morris and make arrangements for payment.

28  (5) David Morris did not mention, propose or claim there was such a
    condition when Mr. Holbech contacted Mr. Silver and told Mr. Silver that,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

following consultation with Mr. Morris, David Morris was prepared to send the entire balance (i.e., both the first and second payments), even though the second payment had not yet come due, to compensate for David Morris' delinquency in making the first payment.

(6) David Morris did not mention, propose or claim there was such a condition when it wired the first payment.

(7) And David Morris did not mention, propose or claim there such a condition at any other time before the second payment came due.

In other words, on multiple occasions, if David Morris had believed the payment obligations under the Agreement was conditional upon obtaining a new certification, it could have stated so. It did not, because there was no such condition.

In addition to never stating there was such a condition, David Morris never acted as if there was such a condition. In particular, David Morris made its first payment due under the Agreement without obtaining a new certification. Put differently, if payment was conditional upon a new certification, as David Morris has suggested after it defaulted on the second payment, why did David Morris make the first payment without obtaining a new certification.

Further, David Morris had the Sapphires re-cut without obtaining a new certification. Again, if payment was conditional upon a new certification, why did David Morris proceed to re-cut the Sapphires, a process which could permanently alter the characteristics of the Sapphires and thereby preclude a certification of the Sapphires in the form that S.H. Silver delivered them to David Morris.

Third, and finally, David Morris' position defies common business sense. As previously noted, it would have made no sense for David Morris to cut the Sapphires if it believed that payment was subject to a new certification because once the Sapphires were cut because the baseline for the certification – the *original* Sapphires – would no longer be the same. By the same token, S.H. Silver never would have – and, indeed, did not – assume the risks associated with David Morris' cutting the Sapphires. In fact, over the course of S.H. Silver's twenty-five-plus years of

business and thousands of successful sales, not once has payment for the sale of jewelry ever been conditioned upon obtaining a new certification following the cutting of the jewelry stones. This would make absolutely no sense for the seller of the jewelry because of the risks associated with cutting the stones. [Silver Decl., ¶ 18.]

### C. S.H. Silver Does Not Seek An Attachment For An Improper Purpose

S.H. Silver also meets the third requirement – that the attachment is not sought for an improper purpose. The sole purpose for which S.H. Silver seeks the attachment is to secure recovery of the amounts David Morris owes it pursuant to the Earring Agreement. [Silver Decl., ¶ 19.] David Morris took possession of the Earrings on July 3, 2007, but has been withholding payment without any legitimate justification for nearly a year, since August 2007. S.H. Silver is entitled to full payment for the Earrings it delivered.

### D. The Amount To Be Secured Is Greater Than Zero

Lastly, S.H. Silver meets the fourth and final requirement that the amount to be secured exceed zero. As previously detailed, S.H. Silver seeks an attachment in the amount of $566,564.43. Because S.H. Silver has met each of the requirements, an attachment should issue.

### IV. CONCLUSION

Because S.H. Silver's claim meets each of the requirements for an attachment, an attachment should issue. David Morris bought a pair of Earrings outright from S.H. Silver, but now refuses to pay for them. After defaulting on its payment obligations, David Morris crafted an "excuse" to try and avoid its obligations, but that excuse is of no moment. The fact of the matter remains: David Morris bought the Earrings, took possession of them, made the first of two payments, and exercised its ownership over the Earrings by cutting (and thereby permanently

altering) the stones in the Earrings.  In short, David Morris has no basis to avoid its obligation to make the second payment.  Accordingly, an attachment in the amount of $566,564.43 should issue.

DATED:  August 1, 2008.

REED SMITH LLP

By    /s/ Jonah D. Mitchell
    Scott D. Baker
    Jonah D. Mitchell
    Attorneys for Plaintiff
    S.H. Silver Company, Inc.